IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BW Industries Inc., *et al.*,[1]<br><br>Debtors. | Chapter 7<br><br>Case No. 23-10844-MFW<br><br>(Jointly Administered) |
| Jeoffrey L. Burtch, Chapter 7 Trustee for the Bankruptcy Estates of BW Industries Inc., *et al.*,<br><br>Plaintiff,<br><br>v.<br><br>Voyager Pacific Opportunity Fund II, LLC,<br><br>Defendant. | Adv. Pro. No. _____ |

## COMPLAINT

Plaintiff, Jeoffrey L. Burtch, chapter 7 trustee (the "Trustee" or "Plaintiff") for the bankruptcy estates (the "Estates") of the above-captioned debtors (the "Debtors"), by his undersigned attorneys, files this complaint (the "Complaint") against Voyager Pacific Opportunity Fund II, LLC ("Defendant"), and in support thereof alleges as follows:

## INTRODUCTION

1. This is an adversary proceeding filed by the Trustee pursuant to 11 U.S.C. §§ 544(b), 548(a), and 550(a) and Fed. R. Bankr. P. and 7001(1), seeking to: (a) avoid prepetition obligations incurred fraudulently by the Debtors in favor of Defendants; (b) avoid and recover

---

[1] The Debtors in these cases are the following entities (the respective case numbers for each estate follows in parentheses): BW Industries Inc. (23-10844-MFW); Bitwise Industries, Inc. (23-10845-MFW); BWRD, LLC (23-10846-MFW); Alpha Works Technologies, LLC (23-10847-MFW); Bruce's Bagels, Beverages, and Bites, LLC (23-10848-MFW).

fraudulent transfers totaling not less than $779,917.81 made by the Debtors to or for the benefit of Defendant.

## JURISDICTION AND VENUE

2. The United States Bankruptcy Court for the District of Delaware (the "Court") has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) because this adversary proceeding arises under and in, and is related to, cases under title 11 of the United States Code (the "Bankruptcy Code"), styled as *In re: BW Industries Inc., et al.*, pending before the Court as Case No. 23-10844-MFW (jointly administered) (the "Bankruptcy Cases").

3. The statutory and legal predicates for the relief sought herein are sections 544(a), 548(a), 550(a), and 704(a) of the Bankruptcy Code, Cal. Civ. Code §§ 3439.04 and 3439.05, and Fed. R. Bankr. P. 7001.

4. This adversary proceeding is a "core" proceeding that may be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2) and the Court has authority to enter final orders and judgments related to matters arising herein.

5. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409 because the Bankruptcy Cases are pending in the District of Delaware.

6. This Court has personal jurisdiction over Defendants because Defendants conducted business in the United States, directed activities toward the Debtors in the United States, and the transfers and obligations at issue occurred in the United States.

7. Pursuant to Local Rule 7008-1, Plaintiff consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## PROCEDURAL BACKGROUND

8. On June 28, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 7 of the Bankruptcy Code.

9. Jeoffrey L. Burtch is the duly permanent trustee of the Estates pursuant to section 702 of the Bankruptcy Code.

## THE PARTIES AND THE DEBTORS

10. Plaintiff is authorized and has standing to commence and prosecute this cause of action pursuant to sections 544, 548, 550, and 704(a).

11. Debtor BW Industries, Inc. is a Delaware corporation, and all of the other Debtors are incorporated or organized under the laws of California. The Debtors' principal place of business was at all times located in Fresno, California.

12. Defendant is a Delaware limited liability company.

## BACKGROUND

### A. Events Leading to the Debtors' Chapter 7 Filing

13. In 2013, Jake Soberal and Irma Olguin (the "Co-CEOs") started the Debtors' business, which would eventually become known as "Bitwise."

14. Initially, the Debtors' operated "Geekwise Academy," a coding and tech skills "bootcamp" that offered courses to people of all ages.

15. While the Debtors were organized and operated as a for-profit business, they were also intended to help train and employ underserved people and to revitalize downtown Fresno, California.

16. Over the following 10 years, the Debtors grew to include three main lines of business: (i) education and training; (ii) software development; and (iii) real estate investments including the acquisition, renovation, and leasing of commercial properties.

3

17. As part of an ambitious growth strategy, the Debtors raised approximately $140 million between 2019 and 2022 through a series of capital investment rounds to enable the Debtors to expand their operations throughout the United States.

18. By the time of their collapse, the Debtors had either opened or were in the process of opening locations across the country, including in Colorado, Illinois, New Mexico, New York, Ohio, and Texas, and had nearly 900 employees.

19. As the Debtors expanded, their operating expenses increased dramatically but their revenue growth did not keep pace with expenses. The Debtors' actual revenues were estimated to be no more than $5 million per year for 2021 and 2022, and that 2023 revenues were on a pace to match the two prior years. In fact, total revenue for the entire first quarter of 2023 is estimated to have been as little as $400,000.

20. At the same time that the Debtors were earning $5 million or less per year, the Debtors' annual expenses are estimated to have been between $50 million and $75 million.

**B. The Co-CEOs' Scheme to Defraud**

21. With such a huge disparity between revenues and expenses, whatever funds the Debtors were able to raise did not last long. The Debtors experienced significant financial stress for several years, but the Co-CEOs managed to conceal the Debtors' financial and operational problems through a wide-ranging scheme to defraud board members, investors, and creditors.

22. The fraudulent scheme involved, among other things: (i) providing false financial statements, which, for example, reported nearly $58.5 million in revenue for 2021 and over $143 million in revenue for 2022; (ii) concealing critical financial information from management personnel who were not participating in the fraud; (iii) delaying payments to creditors; (iv) incurring substantial unauthorized debt; and (v) hiding cash shortfalls through short-term loans and purported sales of "future receipts," with the obligations under the relevant agreements

4

ultimately to be satisfied either through subsequent short-term financing or from funds received as capital investments.

23. The Co-CEOs' conduct went far beyond simple mismanagement, and amounted to one of the most notorious frauds to occur in the Central Valley of California.

24. The Debtors' demise resulted in a number of legal actions outside of the Bankruptcy Cases. Numerous creditors have asserted claims against the Co-CEOs based on alleged misrepresentations, and the SEC commenced a civil enforcement action.

25. The SEC's complaint alleged misrepresentation and falsification of various records associated with solicitation of approximately $70 million from investors in 2022. Consent judgments entered in the SEC action on February 1, 2024 enjoin the Co-CEOs from engaging in various activities and reserve the issues of disgorgement and civil penalties for later determination.

26. In addition, in November 2023, the U.S. Attorney for the Eastern District of California charged the Co-CEOs with conspiracy to commit wire fraud. On July 17, 2024, the Co-CEOs pleaded guilty, and on December 17, 2024, Soberal and Olguin were given prison sentences of 11 and 9 years, respectively.

C. **The Debtors' Resort to Predatory Financing**

27. Since revenues covered only a small fraction of the Debtors' expenses, cash management was a daily concern, as the Debtors were constantly on the verge of exhausting available cash. The Debtors turned to alternative forms of funding including merchant cash advance ("MCA") transactions to cover immediate cash needs.

28. MCA funders provided the Debtors with lump-sums of cash in exchange for the Debtors selling their "future receipts" to the applicable funder. The MCA funders then withdrew fixed amounts of cash from the Debtors' bank accounts on a daily basis until those advances were paid in full.

29. Between May and September 2022, the Debtors entered into at least 11 separate MCA agreements by which the Debtors purportedly "sold" $6.2 million of their future receipts to the MCA funders in exchange for approximately $2.9 million in short-term funding to satisfy the Debtors' immediate cash-flow needs. In exchange for the $2.9 million, after a number of settlements were reached, the Debtors paid the MCA funders approximately $5.3 million.

30. In addition to the MCA transactions, the Debtors incurred indebtedness in transactions that were documented as loans, and which obligated the Debtors to pay unreasonably high interest, fees, or other costs.

31. At no time in 2022 and 2023 did the Debtors have sufficient revenue to meet their obligations under the MCA agreements and other financing agreements.

32. While they had extricated themselves from the burdens under the MCA agreements and certain loan agreements, the Debtors still had substantial indebtedness that was not being paid according to terms.

33. The inevitable finally occurred in May 2023 when the Debtors were unable to find the funding necessary to satisfy their immediate cash needs. While the Debtors' financial statements at the time purported to show available cash of $77.4 million, the Debtors in fact had a small fraction of that amount, and did not even have sufficient funds to cover outstanding checks.

34. Shortly after a board of directors' meeting on May 28, 2023, the Debtors made the decision to immediately furlough all employees and terminate the Co-CEOs' employment. By June 14, 2023, the board made the decision to lay off all employees and begin preparing for a chapter 7 filing.

35. Based on the Trustee's initial investigation, claims against the Debtors will likely exceed $200 million. As of the date of this Complaint, the Trustee has been able to recover approximately $24.3 million.

D. **Defendant's Connections with Debtors**

36. Defendant is one of several lenders affiliated with David Hardcastle ("Hardcastle") that made high interest loans to the Debtors in the year prior to the Petition Date.

37. At all times relevant, Hardcastle, who was Defendant's Chief Executive Officer, was also Manager of 2112, LLC ("2112") and of StarTop Investments LLC ("StarTop").

38. Hardcastle is affiliated with Premier Property Management LLC ("Premier," and, together with Defendant, 2112, and StarTop, the "Hardcastle Affiliated Entities"), in that Andrew Adler, Premier's Managing Member, was also Defendant's Managing Director.

39. Hardcastle and Adler also identified themselves as advisory board members of the Debtors and had personal relationships with Soberal.

40. Due to their relationship with Soberal, Hardcastle and Adler had personal knowledge of the Debtors' financial difficulties, and actively assisted the Co-CEOs in concealing the extent of such difficulties from the Debtors' outside directors and creditors.

41. Knowing of the Debtors' desperate need for cash, Defendant and the other Hardcastle Affiliated Entities took advantage of the Debtors by extending loans on grossly unreasonable and predatory terms.

42. Plaintiff has contemporaneously filed separate adversary proceedings against each of the Hardcastle Affiliated Entities to, among other things, avoid and recover transfers made by the Debtors on account of the predatory high interest loans.

E. **The Voyager Note**

43. On or about December 12, 2022, Debtor BW Industries, Inc. ("BWI") executed a Promissory Note in the face amount of $750,000, payable to Defendant (the "Voyager Note"). A copy of the Voyager Note is attached as **Exhibit 1**.

44. Pursuant to the terms of the Voyager Note, BWI was obligated to pay Defendant the principal amount of $750,000, together with a "fixed loan fee" of $25,000.00 by December 16, 2022.

45. According to its terms, the Voyager Note entitled Defendant to a return on investment of 3.3% over a 4-day term, which is equal to an annualized return of 304%.

46. On December 12, 2022, Defendant wired the sum of $750,000 to BWI.

47. On December 23, 2022, BWI wired the sum of $779,917.81 to Defendant (the "Transfer").

48. A summary of transfers to and from Defendant is attached hereto as **Exhibit 2**.

49. In sum, 11 days after advancing the sum of $750,000.00, Defendant received a payment in the amount of $779,917.81, for an annualized rate of return equal to 132%.

**F. The Existence of Predicate Creditors**

50. There are numerous unsecured creditors that hold allowable unsecured claims in these cases, and that had claims against the Debtors at the time the Obligations were incurred and the Transfers were made, including, but not limited to:

    a. The Bank of New York Mellon Trust Company, N.A. is successor to Trustcorp Bank, Ohio as Trustee;

    b. Venture Lending & Leasing IX, Inc.;

    c. The Sobrato Family Foundation;

    d. The Mitchell Kapor Foundation;

    e. GZ Impact Fund I, L.P.; and

    f. Greenline CDF Subfund XXXVI LLC.

(collectively, the "Predicate Creditors").

51. At all times relevant, the Predicate Creditors had claims against the Debtors that incurred the Obligations and the Debtors that made the Transfers.

52. The Obligations and the Transfers would be voidable by at least one of the Predicate Creditors under applicable law.

## COUNT I
## AVOIDANCE OF FRAUDULENT OBLIGATIONS – CONSTRUCTIVE FRAUD
### (11 U.S.C. §§ 544(b) and 548(a)(1)(B) and Cal. Civ. Code §§ 3439.04 and 3439.05)

53. Plaintiff repeats and realleges the allegations in all preceding paragraphs as if fully set forth herein.

54. BWI incurred certain obligations (the "<u>Obligations</u>") under the terms of the Voyager Note.

55. The Obligations consisted of contractual terms requiring the payment of interest at a rate of 304% per annum.

56. BWI incurred the Obligations within two (2) years before the Petition Date.

57. BWI did not receive reasonably equivalent value in exchange for the Obligations.

58. The Obligations were incurred while the Debtors were insolvent or caused the Debtors to become insolvent.

59. Each of the Obligations was incurred while the Debtors were engaged in a business for which the remaining assets of the Debtors were unreasonably small capital in relation to their business.

60. The Obligations were incurred while the Debtors intended to incur, or believed that they would incur, debts that they would not be able to pay as they became due.

61. By reason of the foregoing, the Obligations are avoidable pursuant to 11 U.S.C. §§ 544(b) and 548(a)(1)(B) and Cal. Civ. Code §§ 3439.04 and 3439.05.

# COUNT II
## AVOIDANCE OF FRAUDULENT OBLIGATIONS – ACTUAL FRAUD
### (11 U.S.C. §§ 544(b) and 548(a)(1)(A) and Cal. Civ. Code §§ 3439.04)

62. Plaintiff repeats and realleges the allegations in all preceding paragraphs as if fully set forth herein.

63. The Debtors incurred the Obligations within two (2) years before the Petition Date.

64. The Debtors incurred the Obligations with the actual intent to hinder, delay, or defraud one or more entities to which the Debtors were or became indebted on or after the date the Obligations were incurred because, among other things:

   a. The Obligations were part of a scheme to defraud creditors and investors that ultimately resulted in the Debtors' shut-down and filing of their chapter 7 petitions;

   b. The Obligations were concealed though various mechanisms including, but not limited to (i) not properly recording the transactions underlying or related to the Obligations in the Debtors' books and records; and (ii) providing false, misleading and manipulated information regarding the Debtors' finances, including the Obligations, to the Board of Directors, investors and other creditors;

   c. The Debtors executed the Voyager Note and incurred the Obligations without the knowledge or approval of the Board of Directors;

   d. The consideration received by the Debtors in exchange for the Obligations was grossly inadequate considering the amounts received by the Debtors and the amounts the Debtors were required to repay;

   e. The Debtors incurred the Obligations for less than reasonably equivalent value; and

   f. The Obligations were incurred while the Debtors were insolvent and while not paying all creditors their invoices as they came due.

65. By reason of the foregoing, the Transfers are avoidable pursuant to 11 U.S.C. §§ 544(b) and 548(a)(1)(A) and Cal. Civ. Code § 3439.04.

## COUNT III
### AVOIDANCE OF FRAUDULENT TRANSFER – CONSTRUCTIVE FRAUD
### (11 U.S.C. §§ 544(b) and 548(a)(1)(B) and Cal. Civ. Code §§ 3439.04 and 3439.05)

66. Plaintiff repeats and realleges the allegations in all preceding paragraphs as if fully set forth herein.

67. The Transfer was a transfer of the Debtors' property.

68. The Transfer was a "transfer" within the meaning of 11 U.S.C. § 101(54).

69. The Debtors made the Transfer within two (2) years before the Petition Date.

70. The Debtors did not receive reasonably equivalent value in exchange for the Transfer.

71. The Transfer was made while the Debtors were insolvent or caused the Debtors to become insolvent as a result of such Transfer.

72. The Transfer was made while the Debtors were engaged in a business for which the remaining assets of the Debtors were unreasonably small capital.

73. The Transfer was made while the Debtors intended to incur, or believed that they would incur, debts that they would not be able to pay as they became due.

74. By reason of the foregoing, the Transfer is avoidable pursuant to 11 U.S.C. §§ 544(b) and 548(a)(1)(B) and Cal. Civ. Code §§ 3439.04 and 3439.05.

## COUNT IV
### AVOIDANCE OF FRAUDULENT TRANSFERS – ACTUAL FRAUD
### (11 U.S.C. §§ 544(b) and 548(a)(1)(A) and Cal. Civ. Code §§ 3439.04)

75. Plaintiff repeats and realleges the allegations in all preceding paragraphs as if fully set forth herein.

76. The Transfer was a transfer of the Debtors' property.

77. The Transfer was a "transfer" within the meaning of 11 U.S.C. § 101(54).

78. The Debtors made the Transfer within two (2) years before the Petition Date.

79. The Debtors made the Transfer with the actual intent to hinder, delay, or defraud one or more entities to which the Debtors was or became indebted on or after the date the Transfers were made because, among other things:

    a. The Transfer was part of a scheme to defraud creditors and investors that ultimately resulted in the Debtors' shut-down and filing of their chapter 7 petitions;

    b. The Transfer was concealed though various mechanisms including, but not limited to (i) not properly recording the transactions underlying or related to Transfer was in the Debtors' books and records; and (ii) providing false, misleading and manipulated information regarding the Debtors' finances, including Transfer was, to the Board of Directors, investors and other creditors;

    c. The Debtors made the Transfer without the knowledge or approval of the Board of Directors;

    d. The consideration received by the Debtors in exchange for the Transfer was grossly inadequate considering the amounts received by the Debtors and the amounts the Debtors were required to repay;

    e. The Debtors made the Transfer for less than reasonably equivalent value; and

    f. The Transfer was made while the Debtors were insolvent and while not paying all creditors their invoices as they came due.

80. By reason of the foregoing, the Transfer is avoidable pursuant to 11 U.S.C. §§ 544(b) and 548(a)(1)(A) and Cal. Civ. Code § 3439.04.

## COUNT V
## TO RECOVER AVOIDED TRANSFER
## PURSUANT TO 11 U.S.C. § 550(a)

81. Plaintiff repeats and realleges the allegations in all preceding paragraphs as if fully set forth herein.

82. Defendant was the initial transferee of the Transfer or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Transfer was made.

83. Plaintiff is entitled to recover from Defendants the value of the Transfer pursuant to 11 U.S.C § 550(a), to the extent the Transfer is avoided pursuant to 11 U.S.C. § 548, plus interest thereon to the date of payment and the costs of this action.

## COUNT VI
## DISALLOWANCE OF CLAIMS
## PURSUANT TO 11 U.S.C. § 502(d) AND (j)

84. Plaintiff realleges and incorporates by reference the allegations of the previous and following paragraphs as if fully set forth herein.

85. Defendant is the transferee of transfers that are avoidable pursuant to 11 U.S.C. §§ 544 or 548, which property is recoverable pursuant to 11 U.S.C. § 550.

86. Defendant has not paid the amount of the avoidable Transfer, or turned over such property, for which Defendant is liable under 11 U.S.C. § 550.

87. Pursuant to 11 U.S.C. § 502(d), any and all claims of Defendant and/or its assignees against the estate of the Debtor that made the Transfer must be disallowed until such time as Defendant pays to Plaintiff an amount equal to the amount of the Transfer, plus interest thereon and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against Defendant granting the following relief:

A. On Count I of the Complaint, judgment pursuant to 11 U.S.C. §§ 544(b) and 548(a)(1)(B) and Cal. Civ. Code §§ 3439.04 and 3439.05 avoiding the Obligations;

B. On Count II of the Complaint, judgment pursuant to 11 U.S.C. §§ 544(b) and 548(a)(1)(A) and Cal. Civ. Code §§ 3439.04 avoiding the Obligations;

C. On Counts III and V of the Complaint, judgment pursuant to 11 U.S.C. §§ 544(b) and 548(a)(1)(B), Cal. Civ. Code §§ 3439.04 and 3439.05, and 11 U.S.C. § 550(a) avoiding the

Transfer and directing Defendant to return to Plaintiff the amount of the Transfer, plus interest from the date of demand at the maximum legal rate and to the fullest extent allowed under applicable law, together with the costs and expenses of this action to the fullest extent allowed under applicable law;

    D.    On Counts IV and V of the Complaint, judgment pursuant to 11 U.S.C. §§ 544(b) and 548(a)(1)(B), Cal. Civ. Code §§ 3439.04 and 3439.05, and 11 U.S.C. § 550(a) avoiding the Transfer and directing Defendant to return to Plaintiff the amount of the Transfer, plus interest from the date of demand at the maximum legal rate and to the fullest extent allowed under applicable law, together with the costs and expenses of this action to the fullest extent allowed under applicable law;

    E.    On Count VI of the Complaint, judgment pursuant to 11 U.S.C. §§ 502(d) and (j) disallowing any and all claims held or filed by Defendant against the estate(s) of the Debtor(s) that made the Transfer until Defendant has returned the amount of the Transfer to Plaintiff; and

    F.    Granting such other and further relief as may be just and equitable.

**COZEN O'CONNOR**

Dated: June 27, 2025

*/s/ Gregory F. Fischer*
Mark E. Felger (No. 3919)
Gregory F. Fischer (No. 5269)
1201 N. Market Street, Suite 1001
Wilmington, DE 19801
(302) 295-2000
mfelger@cozen.com
gfischer@cozen.com

*Counsel for Jeoffrey L. Burtch, Chapter 7 Trustee for the Estates of BW Industries Inc., et al.*